**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**JIMMY DOYLE BUMGARDNER, JR.**                               **PLAINTIFF**

**VS.**                            **CASE NO. 4:08CV00202 SWW**

**CITY OF BENTON, et al.**                                    **DEFENDANTS**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Court Susan Webber Wright. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than eleven (11) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District

1

              Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.       The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

        Clerk, United States District Court
        Eastern District of Arkansas
        600 West Capitol Avenue, Suite A149
        Little Rock, AR 72201-3325

## DISPOSITION

The defendants in this civil rights case seek summary judgment against Jimmy Doyle Bumgardner, Jr. The case stems from Bumgardner's arrest in Benton, Arkansas, on April 20, 2004, and his subsequent conviction and imprisonment. The facts surrounding this arrest are set forth by the plaintiff, by the defendants, and are summarized by the Arkansas Court of Appeals in a decision dated March 14, 2007. The facts are not disputed, and we quote from the Arkansas Court of Appeals' version of the events:

> Appellant Jimmy Bumgardner was charged by felony information with possession with intent to deliver methamphetamine and possession of drug paraphernalia. He entered a conditional-guilty plea and was sentenced to ten years' imprisonment. On appeal Jimmy argues that the trial court erred in its denial of his motion to suppress. We agree and reverse his conviction.
>
> According to the testimony presented during the suppression hearing, this case began on April 20, 2004, when Officer Daniel Creasey approached the home occupied by Jimmy and his wife, Michelle Bumgardner. Michelle was standing on

the porch of the home with a baseball bat in hand. She was shouting obscenities at her husband and instructing him to vacate the property. Jimmy asked Creasey for permission to leave the premises, but Creasey refused the request, explaining that he was investigating "this crime in progress" and that if he made "any determination that [Jimmy had] not done anything wrong, then [he] could leave." Creasey then called for "backup," and followed Michelle into the home but stayed at the front door of the home "so he could watch [Michelle] and watch [Jimmy] at the same time and keep them split up until [his] backup unit could arrive." Creasey explained that he always called for backup in situations involving domestic violence because "you don't never want to go by yourself, it's a dangerous call and anything can happen."

Officer Daniel Richey responded to the call and was asked to "stay with [Jimmy] on the front porch." At the hearing Richey testified that once he arrived at the scene he remained "within about five feet" of Jimmy so that he could "keep an eye on both of them." Creasey then conducted an interview of Michelle, where he learned that she and Jimmy had been involved in a disturbance the previous evening, and this was a continuation of their earlier dispute. Creasey stated that he warned Michelle that he "could have possibly charged her with domestic assault." After this admonition, Creasey noted that Michelle calmed down and explained that she was angry because she believed that Jimmy had her keys and would not give them back.

At the suppression hearing Creasey conceded that at this point in his investigation he had determined that no charges would be filed, and neither party would be arrested. Indeed, Creasey stated that he looked at Jimmy "as the victim." However, Creasey decided to remain at the scene "in the spirit of community policing" and help Michelle recover her missing keys. He approached Jimmy and asked if he had Michelle's keys; Jimmy stated that the only keys he had were his own. Richey then inquired if Jimmy would allow the officers to conduct a pat-down search. Jimmy agreed, but no keys-other than his own-were found. The officers then conducted a fruitless search of the couple's front yard in an attempt to locate the missing keys. At this time, approximately twenty minutes had elapsed since the officers' initial arrival at the scene.

Next, Creasey approached Jimmy, who remained under Richey's watch, and asked for permission to search his vehicle. According to Creasey, Jimmy stated that his truck was locked, then handed Creasey the keys and said, "sure, go ahead." While Creasey was conducting the search of Jimmy's truck, officer Richey remained with Jimmy. Although Creasey failed to locate the "missing keys" during his extensive search of Jimmy's truck, he did find various items used in the manufacture of methamphetamine. Following Creasey's discovery, Jimmy was placed under arrest.

> After his arrest, Jimmy filed a motion to suppress the evidence recovered from his truck because his consent was invalid. Specifically, he argued that he was unlawfully detained in violation of Ark. R. Crim. P. 3.1 and the Fourth Amendment. The State responded that Jimmy was free to leave once Creasey determined that no crime had been committed and that because Creasey chose to remain in the front yard and to cooperate with the officers, his consent was voluntary. The trial court denied the motion, and Jimmy entered a conditional-guilty plea pursuant to Ark. R.Crim. P. 24.3(b).

*Bumgardner v. State*, 98 Ark.App. at 157-158. The Arkansas Court of Appeals went on to hold that Bumgardner was illegally seized at the time he submitted to the search of his vehicle and reversed the trial court's decision. Specifically, the Court cited the following:

> It is what happened after Creasey determined that Jimmy had committed no crime and was the "victim" that is troubling to us. After Creasey made this determination, the continued detention of Jimmy-under Richey's watchful eye-constituted a seizure within the purview of the Fourth Amendment. We are not convinced, as the State argues, that Jimmy should have known that he was free to leave once Creasey had spoken with Michelle and determined that she was not injured or being threatened. Jimmy specifically requested permission to leave the scene and was told that he must remain until the investigation was completed. He was never told that he was free to go or that the investigation had been completed. To the contrary, for twenty minutes Jimmy remained under Richey's care while the officers were actively engaged in a "missing keys" investigation. Jimmy was asked to submit to a pat-down search, asked to produce the keys he had been accused of stealing or throwing in the yard, and asked to submit to a search of his vehicle.
>
> The State would have us require Jimmy to determine the moment the officers' investigation of domestic abuse (which justified his detention) ended and their altruistic key-locating assistance (which did not justify his detention) began. This would require far more of Jimmy than is reasonable or-in this case-possible. After the officers determined that Jimmy was not a suspect, but a victim, the officers conceded that they had no reasonable suspicion to continue his detainment. However, Jimmy was not told that he was free to leave and had no indication that his right to mobility had been restored.

98 Ark.App. at 159-160. The case was remanded with instructions that the evidence seized from

Mr. Bumgardner's truck was suppressed as it was "fruit of the poisonous tree." 98 Ark. App. at 160 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Mr. Bumgardner seeks damages from the City of Benton, the Benton Police Department, Benton Police Chief Gary Sipes, and Benton Police Officers Creasey and Richey, alleging false imprisonment or wrongful loss of freedom and violation of his constitutional rights. Mr. Bumgardner seeks damages in the total amount of $1,525,000, which includes compensation for attorney's fees and for depreciation and wrongful loss of his vehicle.

In order for the defendants to obtain summary judgment, they must demonstrate no genuine issue exists with regard to any material fact, and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In their brief, the defendants correctly note that the Court's duty is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, Inc., 447 U.S. 242 (1986). In addition, a party opposing summary judgment must respond with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Officers Creasey and Richey:** The first argument for summary judgment is that Officers Creasey and Richey are entitled to judgment as a matter of law due to qualified immunity. The standard for qualified immunity is set forth in *McCoy v. City of Monticello*, 342 F.3d 842 (8th Cir. 2003):

> . . . Individual defendants are entitled to qualified immunity unless their alleged conduct violated "clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The law is clearly established if it gives the defendant official "fair warning" that his conduct

> violated an individual's rights when the official acted. *Hope v. Pelzer,* 536 U.S. 730, 739-40, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).
>
> In *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court framed the threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. An officer does not lose his qualified immunity because of a mistaken, yet reasonable belief, nor does an officer lose his immunity because of a reasonable mistake as to the legality of his actions. *Id.* at 205-06, 121 S.Ct. 2151.

342 F.3d at 846. Following the guidelines from *Saucier v. Katz, supra,* our first question is whether, viewing the facts in the light most favorable to Mr. Bumgardner, do the facts show that Officers Creasey and Richey violated a constitutional right? This inquiry is answered in the affirmative because the Arkansas Court of Appeals specifically ruled that the detention of the plaintiff constituted an unreasonable seizure. While it may be pointed out that the trial court specifically found to the contrary with regard to the Fourth Amendment issue, we are obligated to view the facts in the light most favorable to Mr. Bumgardner. Accordingly, we conclude the facts show a constitutional violation, and proceed to the second question posed in the *Saucier* analysis – was the right clearly established? The key to this inquiry is determining "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202.

Officers Creasey and Richey arrived during a domestic disturbance, and there is no debate

that detention of Bumgardner was appropriate at the outset, as the officers sorted out the circumstances. The Arkansas Court of Appeals found that the detention became unlawful only after the officers determined that Mr. Bumgardner was not a suspect in the domestic disturbance yet did not inform him at that time that he was free to go. Our inquiry is whether it was clear that Creasey and Richey unlawfully detained Bumgardner during the course of the encounter. We do not find that a reasonable officer would have clearly known the detention of Bumgardner was unlawful. A major reason supporting this conclusion is that the state court judges faced with this issue reached different conclusions. The trial judge, denying the motion to suppress, found: "The 'search' was pursuant to consent by the defendant"; "It is unrefuted that the defendant was not intimidated, and therefore the consent is deemed voluntary"; and "It is unrefuted that at the time the defendant granted consent he was not restrained and was in fact free to go." Docket entry no. 31-7. Although the Arkansas Court of Appeals later reversed this ruling, it is significant that the two state courts disagreed on the outcome. The officers on the scene, in the heat of the moment, may have erred[1]. However, in light of the divergent opinions offered by the state court rulings, the most that can be said is that the officers were mistaken, yet reasonable, in acting as they did. There is simply no showing that the officers *knew* their actions to be unlawful. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986). We are

---

[1] In their brief, the defendants contend that they did not err under the law as it existed at the time and, indeed, as it now stands. We need not decide that, as it is clear that there was arguable probable cause for the detention and subsequent arrest of the plaintiff. *Hunter v. Bryant*, 502 U.S. 224 (1991).

not suggesting that qualified immunity applies in every instance in which state courts disagree on the legality of a detention or arrest. For example, a state trial court which clearly misapplied the law or overlooked the prevailing precedent would not provide a basis for qualified immunity. Here, however, the state appellate court did not reverse the trial court due to the trial court's failure to apply the proper legal standard. Instead, the state trial and appellate courts analyzed the undisputed facts and applied the law, reaching reasonable but different conclusions. Since Officers Creasey and Richey acted reasonably, although ultimately mistakenly as to the legality of their actions, they are entitled to qualified immunity, and we recommend the case against them be dismissed on that basis.

**Chief of Police Gary Sipes:** The plaintiff alleges Sipes, the Benton Police Chief, is liable as the supervisor of Creasey and Richey, and also because Sipes had actual knowledge of the plaintiff's arrest, having read the report submitted by Creasey and Sipes. Defendant Sipes correctly contends he is entitled to judgment as a matter of law. The mere fact that he supervises Creasey and Richey is an insufficient basis for imposing liability. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978); *Otey v. Marshall*, 121 F.3d 1150 (8th Cir. 1997). In addition, the mere reading of the reports submitted by Creasey and Richey does not provide a basis for liability. This is particularly true in light of our previous finding that Creasey and Richey acted, at the worst, reasonably but mistakenly. We recommend that the motion for summary judgment of Sipes be granted.

**City of Benton:** Mr. Bumgardner cites his detention and arrest as evidence that the City of Benton should be held liable. He alleges that the City of Benton had a policy or custom sanctioning illegal detentions by police officers. However, the sole incident cited by Mr.

Bumgardner does not demonstrate a policy or custom on the part of the City of Benton. *See Board of County Comm'rs v. Brown*, 520 U.S. 397 (1997). Instead, it demonstrates only that Officers Creasey and Richey may have mistakenly detained Mr. Bumgardner under some trying circumstances. Mr. Bumgardner cites no municipal policy, nor does he suggest or prove some pattern of behavior by Benton police officers that was approved by the municipality. This absence of a policy or a custom on the part of the City of Benton is fatal to the claim, and the City of Benton is entitled to judgment as a matter of law.

**Summary:** For the foregoing reasons, the defendants are entitled to judgment as a matter of law. We recommend that their motion for summary judgment be granted.

IT IS SO ORDERED this   10   of December, 2008.

_____
UNITED STATES MAGISTRATE JUDGE